Whitaker, Judge,
delivered the opinion of the court:
Stated in its simplest terms and omitting some important details, plaintiffs’ claim is that they acquired ownership of the timber on a certain tract of land by virtue of a contract with the Indian Service of the Department of the Interior, and that they disposed of it to a corporation organized by them and of which they were the sole stockholders, except for two qualifying shares, after having held it for more than six months, and that they are thus entitled to treat the gains derived from the disposition of it as capital gains.
The Commissioner of Internal Revenue did not question that the taxpayers and the corporation were separate entities and that gain was realized when the taxpayers transferred to the corporation their rights under the contract, but he says this gain was ordinary income, instead of capital gain, and he assessed the tax accordingly.
That is the sole issue presented to us, and it is the sole issue we decide.
Plaintiffs Barclay reported the income derived from the sale of timber on the Warm Springs Indian Reservation in Oregon in their tax returns for the calendar years 1951,1952, and 1953 as long-term capital gains; plaintiffs Dahl did the same thing in their returns for the years 1950, 1951, 1952, and 1953. In each case, the Commissioner of Internal Revenue assessed deficiencies against these taxpayers upon the ground that the income for those years was ordinary income. *425 The taxpayers paid the deficiencies and filed timely refund claims. The claims were disallowed, and these suits followed.
The income was earned by plaintiffs Harold Barclay and Philip Dahl; their wives are parties to this litigation only because, for the taxable years with which we are concerned, they filed joint returns with their husbands. Dahl and Barclay will hereafter be referred to as the plaintiffs.
On November 26, 1948, the United States Department of the Interior issued an advertisement for bids for the purchase of merchantable timber on 51,883 acres of the Warm Springs Indian Beservation known as the “Simnasho Logging Unit.” The advertisement specified that the unit contained approximately 107,500,000 board feet of timber, of which approximately 33,300,000 board feet stood on lands that had been alloted to individual Indians. Bids, accompanied by a cash deposit of $35,000, were required to be submitted by January 17, 1949.
Harold Barclay and Philip Dahl, who for several years had carried on a partnership called the Barclay Logging Company, jointly visited the local office of the Forestry Division of the Bureau of Indian Affairs to obtain more information about the timber. Barclay then hired a timber evaluation expert, Hans Milius, and went with him and Dahl and two representatives of the Indian Services on a field trip to survey the timber. After Milius reported that he deemed the prospective purchase a sound investment, plaintiffs decided to make a bid. On J anuary 17, 1949, the last day on which bids could be submitted, they went to the office of the Indian Bureau, where Dahl, in his own name, submitted a bid at the minimum price of $10.50 per thousand board feet for Ponderosa Pine and $6 per thousand board feet for all other species. Dahl also deposited his certified check for $35,000. This was the only bid submitted.
In response to this bid, the Assistant Secretary of the Interior on J anuary 31,1949, sent a telegram to the Superintendent of the Warm Springs Indian Agency, accepting Dahl’s bid and instructing him to submit “a bond and supporting papers for approval.” The Tribal Council of the Confederated Tribes of the Beservation, which had previ *426 ously approved the terms of the invitation, agreed on February 8,1949, to the acceptance of Dahl’s bid.
Dahl signed the formal “Timber Sale Contract” and submitted a $40,000 performance bond on March 7,1949. These documents were forwarded to Washington but were not formally approved on behalf of the Secretary of the Interior until May 2,1949. That contract gave plaintiffs the right to the timber on the unallotted lands (i.e., the land which the Department of the Interior held in trust for all Indians on the Reservation) in the Simnasho Unit, but approximately one-third of the timber on the Simnasho Unit was on acreage that had been allotted to individual Indians, and, by the terms of the agreement with the Government, separate contracts had to be entered into with the allottees before timber on their allotments could be removed. After the Superintendent of the Indian Agency contacted the various allottees and obtained powers of attorney from them, he entered into separate contracts with plaintiffs on their behalf. These contracts were signed between October 10', 1949, and April 8, 1953.
During April of 1949, with the permission of local officials of the Bureau of Indian Affairs, plaintiffs began the construction of a sawmill on the Simnasho Tract. The mill was constructed with the funds, equipment, and personnel of the Barclay Logging Company, a partnership in which Barclay and Dahl were equal partners, and its cost was charged to the accounts of the plaintiffs on the partnership books in equal amounts. Construction of the sawmill was completed in November of that year.
On October 21,1949, plaintiffs formed a corporation, called Dahl Pine, Inc., under the laws of Oregon. Four days later, at the first meeting of the stockholders, plaintiffs transferred the uncompleted sawmill to the corporation in exchange for all the stock and the corporation’s promise to pay Barclay Logging Company the difference between the cost of the mill and the par value of the stock. On the same date, Dahl lent $100,000 in cash to the corporation, and he also executed a formal assignment to Barclay of a one-half interest in his contract with the Indian Service, in consideration of the *427 payment of one-half of the sums Dahl had paid the Indian Service. The purpose of this assignment was to put into written form the prior oral understanding between Dahl and Barclay that they would share equally in the profits resulting from the contract.
After Dahl Pine, Inc., had been formed, it carried out the terms of the parties’ previous oral understanding relating to the cutting and selling of the timber, which was that Barclay Logging Company would cut the timber after it had been scaled (i.e., measured to determine how many board feet of lumber it contained) by crews from the Indian Service, and deliver it to the corporation’s mill. The corporation would then cut it into rough lumber and sell it. Out of the revenue it received, the corporation would pay plaintiffs the fair market value of the timber from which the logs had been cut.
The taxpayers say they are entitled to treat this income (the difference between what they paid for the timber and what Dahl Pine, Inc., paid them for it) as long-term capital gains under the provisions of either section 117(a) or section 117 (k) (2) of the Internal Revenue Code of 1939. Section 117(a) deals with capital gains generally, while section 117 (k) speaks specifically of transactions in timber. Defendant does not deny that gain was derived by plaintiffs from their sale to Dahl Pine, Inc., but it says it was ordinary income and not capital gain. It denies the applicability of either section 117(a) or of section 117 (k) (2).
We hold that these taxpayers are entitled to treat the income derived from the disposition of timber from the lands held in trust for all Indians on the Warm Springs Reservation as long-term capital gains under section 117 (k) (2) of the 1939 Code, but, as to the income derived from timber on allotted lands, we hold that plaintiffs are not entitled .to do so, because they had not held the timber more than six months before they disposed of it, which is a necessary requirement of both section 117(a) and section 117(k) (2). Since we .think the transaction comes within the terms of section 117 (k) (2), we need not discuss the applicability of section 117 (a).
*428 Section 117(k) (2) of the Internal Revenue Code of 1939 reads:
In the case of the disposal of timber * * * held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber * * * the difference between the amount received for such timber * * * and the adjusted depletion basis thereof shall be considered as through it were a gain or loss, as the case may be, upon the sale of such timber * * *.
In order to qualify under this section for capital gains treatment of income arising from a disposition of timber: 1. the taxpayer must be an “owner” of the timber; 2. he must make a “disposal” of it under a contractual arrangement by which he retains an economic interest in it; and 3. the taxpayer must have held the timber for more .than six months prior to the disposal. Plaintiffs say the transactions in this case meet all three requirements; defendant says they meet none of them. We shall discuss them in order.
1. Were plaintiffs the owners of the timber? The advertisement of the Indian Service, acting on behalf of certain Indian Tribes, solicited bids “for the purchase of merchantable timber” on the Simnasho Logging Unit. Dahl bid for the purchase of the timber. The contract, denominated a “Timber Sales Contract,” provided that the Confederated Tribes of the Warm Springs Reservation “agree to sell” and the “purchaser agrees to buy * * * all merchantable dead timber * * * and all merchantable live timber” marked for logging by officials of the Indian Service. It provided that all the timber would be cut by April 1, 1960, and paid for, and that, during the course of performance, a minimum of 10 million board feet of timber per year would be cut and paid for. The price to be paid for the several varieties was specified, but, since the term of the contract was about 11 years, it was subject to adjustment, up or down, if the market changed from time to time by a stated amount. The sum of $35,000 was required to be deposited as an advance payment for the timber to be cut, and it was agreed that further advance payments would be made as the cutting progressed and in advance of it. The rates prescribed, in *429 paragraphs 8 and 9 of the contract, were “stumpage” rates based upon the “stumpage value of the timber.” Stumpage rates are payments for standing timber. Guistina v. United States, 190 F. Supp. 303, 313 (D. Ore. 1960), aff'd 313 F. 2d 710 (9th Cir. 1963). Plaintiffs bought the standing timber, not the logs after they had been cut. Plaintiffs were not only obligated to cut 10 million board feet a year but they were also obligated to pay for 10 million board feet a year. They were obligated to cut all the timber by 1960 and to pay for all of it by that time. They did not buy only such timber as they cut; they bought all the merchantable timber on the tract.
Under this contract Dahl did not acquire legal title to the timber on unallotted lands but he did acquire beneficial ownership of all the timber on the tract. Only he and his associates had the right to reduce the timber to possession and to sell it to whomever they pleased. They had the right to do so against all the world, including the United States and the Indians. Not only did they have the right to cut the timber, they were obligated to do so, and could have been forced to do so and could have been forced to pay for it. They bought not an undetermined part of the timber on the tract, depending on how much they cut, but all of it, for their contract required them to cut 10 million board feet each year, and the entire tract by April 1,1960.
It was only Dahl and his associates that had the right to exercise dominion and control over the timber. This we think made them “owners” of all the merchantable timber on the tract, as that word is used in section 117 (k) (2) of the Internal Revenue Code of 1939. The right in the Indian Service to designate the trees to be cut did not limit the amount purchased or circumscribe the obligation to cut; this right was reserved only for the purpose of determining what timber was merchantable. All that was merchantable was sold to plaintiffs and purchased by them.
It matters not that legal title did not pass to the purchasers when the contract was signed; beneficial ownership, good against all the world, did pass, and this is sufficient, we think, to make them the “owners” of the timber within the intent of section 117 (k) (2) of the Internal Revenue Code. Legal title *430 was retained by the vendors only as security for future payments of the purchase price.
We think this view is in accord with that of the Supreme Court of Oregon, as expressed in the opinion in Paullus v. Yarbrough, 219 Ore. 611, 347 P. 2d 620 (1959). The contract in that case was similar to the one before us except that no deposit was made to guarantee the payments agreed upon. The court held that, whether legal title passed or not, equitable or beneficial ownership did pass.
The contract in Wilson v. Commissioner, 26 T.C. 474 (1956), was substantially the same as that in Paullus v. Yarbrough, supra, except that in Wilson a deposit of $5,000 was required, as in this case, and the vendees were also required to pay the taxes. (The payment of taxes was not required in the case at bar because the lands belonged to the United States and hence no taxes were payable.) The Tax Court held that the sellers of the timber were conditional vendors and that, while they retained the legal title, the other contracting party became conditional vendees and, hence, the owners in equity and, as such, “owners” within the meaning of section 117 (k) (2) of the Internal Revenue Code of 1939. To the same effect is Hitchcock v. Frank, 63-1 U.S. Tax Cas. 9497, 11 Am. Fed. Tax R. 2d 1703 (D. Wash. 1963).
The Tax Court relied upon the decision of the Supreme Court of Oregon in Paullus v. Yarbrough, supra, as establishing property rights in such cases. The defendant questions whether state law is controlling in a case where the United States is one of the contracting parties; but the District Court in Guistina v. United States, supra, was of the opinion that, whether state law or federal law was applicable, the result was the same. It was there held that the purchaser became the “owner” of the timber within the meaning of that word as used in section 117 (k) (2). The Court of Appeals agreed. The opinion of the Court of Appeals is particularly applicable to the facts of this case.
In an earlier case (Jantzer v. Commissioner, 284 F. 2d 348 (9th Cir. 1960)), the same circuit had reviewed a decision of the Tax Court which had reached a result contrary to the Wilson decision, but we think the facts in the two cases are different. In the Jantzer case the Tax Court pointed out *431 these differences. It said that in Wilson (as in the case at bar), all the timber had to be cut by a definite time, whereas there was no such time limit in Jantzer. Also, taxes in Wilson were paid by the purchaser, but by the seller in Jantzer (a distinguishing factor that has no bearing upon the instant case, for the reason above stated). Again, the contract in Jantzer was assignable only with the consent of the seller.[1] There was no such restriction in Wilson. In view of these differences in the facts of the two cases, the Tax Court in Jantzer held that petitioners were not the owners. The Court of Appeals was troubled about the decision of the Tax Court, but it affirmed it, because it was not “clearly erroneous.”
The Court of Appeals in the later case of Guistina v. Commissioner, supra, evidently did not think its opinion was contrary to its former opinion in the Jantzer case, nor do we. In its opinion in the later case it took the same position we take, on facts substantially the same.
Defendant says that if plaintiffs became the owners of the timber, the Government would have required that they carry insurance on it. It might or it might not have. Plaintiffs were financially responsible, they had deposited a bond to secure performance of their contract and the Government probably thought this sufficient.
It is not clear what was intended by section 14 of the contract. That section provides that plaintiffs will pay for fire damage to the young growth (which they did not buy) and to “all timber 10 inches and larger in diameter at 4% feet from the ground and to any other property of the Indians or the Government.” Plaintiffs bought only Ponderosa pine and Douglas fir. Whether this clause referred to other trees or to them and the Ponderosa pine and Douglas fir as well, we do not know. Ordinarily, of course, the owner of the timber would have to stand loss from fire, but it is not necessarily inconsistent with the position that plaintiffs had purchased all the timber, that the seller should agree to relieve them of their bargain as to trees destroyed by fire not due to their negligence. At any rate, this clause is not sufficient to *432 counter-balance the other indicia of ownership set out above.
The same, or a similar, provision was in the contract in the Guistina case, but the court held, notwithstanding, that there had been a sale of the timber.
On the whole, we hold that plaintiffs in the case at bar became the “owners” of the timber, as that word was used in section 117(k) (2).
2. Did plaintiffs make a “disposal” of timber under a form of contract by which, they retained cm economic interest i/n the timber? Plaintiffs’ alleged disposition of the timber was to Dahl Pine, Inc., their wholly-owned corporation. Defendant admits that there was a valid sale from plaintiffs to Dahl Pine from which plaintiffs derived gain, but it says it is taxable as ordinary income, and not as capital gain, because what plaintiffs disposed of was not the timber they had acquired but the cut logs, when and as they were delivered to the sawmill. To come within section 117(k) (2), the disposal must have been of the standing timber rather than the cut logs. See Ray v. Commissioner, 32 T.C. 1244 (1959), aff’d 283 F. 2d 337 (5th Cir. 1960).
The logging work was done neither by the plaintiffs nor by the corporation but by Barclay Logging Company, which felled the trees, bucked them (i.e., converted them into logs), and moved them to the mill. The question is, whose trees was Barclay Logging Company cutting, plaintiffs’ or Dahl Pine’s? To put the question another way: was the partnership acting as agent of the plaintiffs or of the corporation?
Regrettably, plaintiffs had no written contract with Dahl Pine. As the trial commissioner says, the parties were dealing with themselves, as individuals on the one hand, as partners in the Barclay Logging Company on another, and as officers of the corporation on another. In such a situation, the commissioner says, oral understandings are not uncommon in the timber industry (finding 28). One thing seems fairly evident, as plaintiff Dahl admitted on the witness stand: Dahl Pine, Inc., was organized for the purpose of securing capital-gains treatment of the income derived from this venture, and this could be done only by a transfer to the corporation of plaintiffs’ rights of ownership in the *433 timber under tbeir contract with the Indian Service. We must read the commissioner’s finding 26 in the light of this fact. This finding reads:
When Dahl and Barclay organized the Dahl Pine, Inc. corporation, it was their understanding that Barclay Logging Company would cut the timber required by the contract, that Dahl Pine, Inc. would mill and sell this timber, that Dahl Pine, Inc. periodically would pay Dahl and Barclay as individuals the fair market value as determined by them of the timber cut [at stumpage rates], and that Dahl and Barclay in turn would make the payments to the Bureau of Indian Affairs required under the contract. There was nothing put in writing either contemporaneously or at any time subsequently which spelled out definitively the details of the various obligations assumed by Barclay and Dahl as individuals, or by Barclay and Dahl as partners doing business under the name of the Barclay Logging Company, or by the Dahl Pine, Inc. corporation, of which Barclay and Dahl were the sole owners, incident to the carrying out of such understanding.
In finding 31 the commissioner also says that separate books were kept for the individuals, for the corporation, and for the partnership, and that Dahl Pine paid the individuals for “the timber that was cut * * * as it was cut.” This means they paid .the stumpage rates for the standing timber. No exception is taken to either of these findings by either party.
The evidence also shows that Barclay Logging Company was paid for its services by the corporation, Dahl Pine, Inc., which, as stated, maintained separate books and a separate bank account from both the Logging Company’s and the plaintiffs’. Since the partnership was paid by the corporation, it must have cut down the trees as agent of the corporation.
While the corporation did not pay for the timber until it was cut, nevertheless it bought all the timber on the entire tract, because finding 26 says that it was the “understanding that Barclay Logging Co. would cut the timber required by the contract,” that is, 10 million board feet a year and the entire tract by April 1,1960, and that the corporation would *434 mill it and sell it. The corporation, therefore, agreed to mill and sell all the timber on the entire tract.
We must confess that where the same persons are dealing with themselves in different capacities, it is quite difficult to determine which costume they were wearing when they did this thing or that thing; but, as we have stated, defendant makes no point of the fact that plaintiffs were dealing with themselves. This being so and in view of the purpose for which the corporation was formed, it must be held that the individuals disposed of their rights of ownership in the timber to the corporation.
While there was no written contract in this case and the dealings between the individuals and the partnership and the corporation were most informal, it must be remembered that the statute speaks of a disposal “by any form or type of contract.” This language covers just about every means by which people come to an understanding with one another. It could cover the lift of a finger or the winking of an eye or the nod of the head at an auction sale — any means by which people come to an agreement with one another. There is more than one troublesome feature to this case, but this is not one of them. Dahl Pine, Inc., was obligated to accept and pay for whatever Barclay Logging delivered to it, and the Logging Company was obligated to cut and deliver all the specified timber on the tract. In this vital respect this case and the Jantzer case, supra, differ in their facts. See Ray v. Commissioner, supra; Timber Conservation Co. v. United States, 208 F. Supp. 626 (D. Ore. 1962).
In their understanding with the corporation, plaintiffs, of course, retained an economic interest in the timber. The commissioner has found that the corporation agreed to mill and sell the timber as cut by the Barclay Logging Company and to pay the fair market value of it to the plaintiffs, who would in turn pay the Indian Service the price they were obligated to pay under their contract. This was done. Dahl and Barclay looked to the corporation as the source of the wherewithal with which to meet their contractual obligations. It is manifest that they retained an economic interest in the timber disposed of. This arrangement, as the Tax *435 Court has said, is “[t]he most common instance of [a] disposal of timber with an economic interest retained * * *” Ray v. Commissioner, supra, at 1250. We so held in Union Bag-Camp Paper Corp. v. United States, 165 Ct. Cl. 525, 325 F. 2d 730 (1963).
The situation here is unlike the facts in Boeing v. United States, 121 Ct. Cl. 9, 98 F. Supp. 581 (1951), where the owner did not come within section 117 (k) (2) because he had made an outright lump-sum sale of the timber.
For these reasons, we hold that plaintiffs made a disposal of timber by a form or type of contract by virtue of which they retained an economic interest in the timber.
3. Did plaintiffs hold their timber for more than six months prior to the disposal? In order to qualify their transactions for capital-gains treatment under section 117 (k) (2), plaintiffs must have owned the timber for a period of six months prior to the date they disposed of it. Defendant contends that the date of the disposal was October 25, 1949, when the first meeting of the shareholders of Dahl Pine, Inc., was held. On that date, plaintiffs put into effect their arrangement to dispose of their timber to the corporation. In this, defendant is clearly correct, although the actual cutting and milling of the timber acquired under the contract did not take place until a later date. Springfield Plywood Corp. v. Commissioner, 15 T.C. 697 (1950); 3B Mertens’ Law of Federal Income Taxation 548 (Zimet & Weiss rev. 1958).
The critical issue, therefore, is the date of acquisition of ownership of the timber. Was it acquired by one or both of the plaintiffs on or before April 25, 1949 ? We will deal with each plaintiff separately, considering, first, when their rights in the timber on so-called unallotted lands were acquired and, second, when their rights of ownership of timber on lands that had been allotted to individual tribal members were acquired.
a. Philip Dahl. — In response to the Interior Department’s advertisement, Dahl on January 17, 1949, submitted his bid and made a deposit of $35,000 and in all other respects complied with the terms of the advertisement. The evidence indicates that, at that time, he was in all respects an acceptable *436 bidder and the officials of the local Indian Agency so regarded him. His bid was the highest — indeed the only one submitted. The regulations of the Interior Department, which are authorized by the statute permitting the sale of timber on unallotted lands,[2] provided, in part:
Acceptance and rejection of bids. In ordinary circumstances the high bid received in connection with any advertisement issued under authority of this part shall be accepted. However, the officer authorized to approve the contract shall have the right to reject the high bid and readvertise if he considers the high bidder to be unqualified to fulfill the contractual requirements of the advertisements. 25 C.F.R. § 61.16 (1949).
Under this regulation, which in the circumstances, had the force of law (Cf. G. L. Christian & Associates v. United States, 160 Ct. Cl. 58, 312 F. 2d 418 (1963)), Dahl’s bid could have been rejected only upon the ground that he was “unqualified to fulfill the contractual requirements.” Since he was experienced in the lumbering business and had a one-half interest in a partnership with the men, money, and equipment to perform the logging, and was financially and otherwise responsible, his bid could not have been rejected because he was “unqualified to fulfill the contractual requirements.” His bid was, in fact, accepted, in accordance with its terms, on January 31, 1949, by a telegram from William E. Warne, an Assistant Secretary of the Interior Department. The necessary authorization to enter into the contract was given by the Tribal Council on February 8, 1949.[3] We think that Dahl’s holding period began to run on that date, prior to April 25, 1949.
The advertisement stated that the contract to be entered into could be obtained from “The Superintendent, Warm Springs Indian Agency, Warm Springs, Oregon.” Therefore, the terms of the contract were known to defendant and, at least constructively, to plaintiffs. Not only this, but the testimony shows that copies of the contract had been circulated among dealers in timber in this region, including plaintiffs, who the testimony shows, had actually seen it. Dahl, *437 therefore, must be held to have put in his bid with the provisions of the contract in mind. It must, therefore, be held that on the date plaintiffs put in their bid, the minds of the parties met. After the date their bid was accepted by the Department and the Tribal Council, both parties were contractually bound to do business with one another on the terms set out in the contract. Nothing in the advertisement for bids postponed the effective date of the sale beyond that time. If after February 8, the Government had refused to conclude the formal contract and to permit the cutting and sale of timber on unallotted lands within the Simnasho Unit, it would have been liable to Dahl, and its liability would have extended, not merely to payment of his expenses up to that time, but to the profit he would have made on the sale of the timber. United States v. Purcell Envelope Co., 249 U.S. 313 (1919), affirming 51 Ct. Cl. 211 (1916). The actual execution and approval of the formal document “was not essential to the consummation of the contract.” United States v. Purcell Envelope Co., supra, at 319.
Defendant argues that Dahl’s period could not have commenced before the date the contract was formally approved by Assistant Secretary Warne on behalf of the Secretary of the Interior, on May 2, 1949, or, at the earliest, on April 28,1949, the date of the letter of transmittal of the approved contract to the Warm Springs Indian Agency, because paragraph 19 of the contract recited :
It is further uNderstood and agreed that this contract shall be null and void and of no effect until approved by the Secretary of the Interior * * *.
This clause of the contract, however, can have no application to a case where the bid is accepted by the same Assistant Secretary who signed the formal contract. This clause was a standard one, directed to a situation in which the bid was approved by a subordinate official without authority to execute the formal contract.
Nor does the regulation of the Department of the Interior requiring that no timber of a stumpage value of $100,000 or more be sold without the approval of the Secretary (25 C.F.R. § 61.20 (1949)) prohibit approval in advance of the formal signing, as was done in this case. It is evident that the pur *438 pose of the Interior Department’s regulation was to insure that contracts involving large sums and great quantities of timber could not be made without the consent of officials at the highest level; these officials had to satisfy themselves that, in the disposition of these valuable assets, there would be no overreaching of or fraud upon the Department’s Indian wards and that the prospective purchaser was capable of fulfilling his contractual obligations. But here the telegram which accepted Dahl’s bid was sent by the same Assistant Secretary who was authorized to and who ultimately did approve and execute the formal contract on the Secretary’s behalf. When the Assistant Secretary gave his approval to Dahl’s bid, all of the necessary elements of the contract — the price to be paid, the quantity of timber to be sold, the time permitted for performance, and the financial character of the purchaser — were placed before the appropriate official at the Secretarial level, and he consented to them. After that official acted and the Indian Council gave its consent, there was nothing more to be approved. To say that no contract came into existence until he signed the formal document would exalt form over substance and make a nullity of the Purcell Envelope doctrine.
We therefore conclude that the terms of paragraph 19 and the regulation requiring Secretarial approval were complied with when the Assistant Secretary of the Interior, who was authorized to approve the contract, accepted Dahl’s bid and the Tribal Council authorized the contract. Our view is in accord with the holdings of the United States District Court for Oregon in Hitchcock v. Frank, supra, and Guistina v. United States, supra.
Dahl must, therefore, be regarded as having held the timber on unallotted lands for a period of more than six months.
b. Harold Barclay. — The taxpayers say that Barclay’s holding period was coextensive with Dahl’s. Defendant contends that, if Barclay ever became an owner of the timber on this land, he acquired his one-half interest therein at a much later date than Dahl did. As evidence of this, defendant points to the fact that Dahl submitted his bid in his *439 name alone upon a “proposal” form supplied by .the Indian Bureau, which read, in part, as follows:
If the proposal is made by individuals, acting neither as a firm nor as a corporation, each must sign.
If the proposal is made by a copartnership, the signature must consist of the name of the firm followed by the signature of each of the members of the firm.
Dahl alone signed the form. He submitted a cash deposit out of his own funds. He did not make a formal written assignment of half of his interest in the contract to Barclay until October 25,1949, at which time Barclay paid him one-half of the advance purchase deposits that he had expended as of that date. Dahl’s 1949 income tax return reported a sale to Barclay on October 25,1949, of a half interest in the contract.
Defendant derives from these formal indicia the conclusion that Barclay’s ownership did not commence prior to the date of the formal assignment, the same day the disposal of the timber was made. Until that day arrived, defendant says, Barclay had, at most, only Dahl’s agreement to assign a half interest in the contract to him at some indefinite future time.
But this is not the end of the matter. It is a familiar axiom of tax law that the wording of formal instruments is not always determinative of the tax consequences of the transactions of which they are a part. Although Dahl signed the bid as an individual, was he, in fact, acting both for himself and for Barclay? Were they, in fact, joint venturers acting jointly, with joint contributions of funds and labor, throughout their course of dealing with the Indian Service? The issue is a factual one, and we must look to all of the circumstances to find the answer. Cf. Commissioner v. Culbertson, 337 U.S. 733 (1949).
Since the question is essentially factual, we must rely quite heavily upon the findings of the trial commissioner, to which neither party takes exception. He has found that, from the outset, the plaintiffs intended to embark on the venture as partners and to share equally in any profit resulting from it. It was Barclay who hired and paid the timber evalúa *440 tion expert who surveyed tbe logging unit to determine its profitability. This expert reported Ms findings to Barclay, and Barclay passed .tbem along to Dahl. Both Barclay and DaM participated in the surveying expedition. They jointly decided to submit a bid. Both men went to the Indian Office to submit it. The Indian Service officials who participated in the transaction at this stage apparently had full knowledge of Barclay’s interest in the purchase. Thereafter, the Barclay Logging Company, a partnership in which Barclay was a half owner, began constructing a sawmill to process the timber contracted for. As of October 25,1949, the partnership had expended a .total of $155,000 in constructing it. This was charged equally to the capital accounts of Dahl and Barclay on the boobs of the Barclay Logging Company.
Thus, it appears that as of the date when the formal written assignment was made, Barclay had not only contributed a personal effort, but also his business judgment and more than $75,000. Quite clearly, he was interested in the enterprise equally with DaM. That he had not paid his share of the cash expenditure at the time the bid was made is inconsequential in view of the large investment of his funds in the sawmill.
What, then, shall be made of the language of the formal written assignment, which speaks in terms of a present transfer of an interest in the contract: “the undersigned [DaM] hereby sells, assigns, transfers and sets over unto Harold Barclay an undivided one-half interest in and to said contract * * *” A sufficient answer is found in the findings of the trial commissioner with respect to this document. It did not, he has found, intend a present assignment as of the date it was executed. Bather, its purpose “was to put in writing the previous oral understanding of the parties concerning Barclay’s sharing in the profits arising from the disposition of the timber itself as well as from the logging operation.” (Finding 25 (d).) In the absence of exception to this finding, it must be taken as true.
We, therefore, conclude that the assignment was merely the formal evidence of a pre-existing relationship, a relationship which existed as a joint venture from the outset, as the commissioner has found.
*441 It therefore follows that Barclay’s holding period began at the same time as Dahl’s, and that, as to the timber on un-allotted land, Barclay has satisfied the six months’ holding period requirement.
c. Timber on allotted lands. — A distinction must be drawn between the lands which were held in trust for individual allottees and those which were administered for the benefit of all Indians who resided on the Warm Springs Reservation. This distinction is the result of the differing statutory treatment given the sale of the timber located on each type of real estate. As to unallotted lands, section 7 of the Act of June 25, 1910 (36 Stat. 855, 857, 25 U.S.C. § 407 (1958)), permits the Secretary of the Interior to sell “all the mature living and dead and down timber” thereon under such regulations as he may prescribe. As to this timber, the Secretary was permitted to and, as we have held, did make a sale of it to plaintiffs without any further formality.[4]
The statutory provisions with respect to timber on allotted acreage are, however, significantly different. As to this timber, section 8 of the Act of June 25, 1910 (25 U.S.C. § 406), supra, provides:
The timber on any Indian allotment held under a trust or other patent containing restrictions on aliena-tions, may be sold by the allottee, with the consent of the Secretary of the Interior * * *
We see, therefore, that the Secretary had no statutory authority to sell the timber that stood on allotments; his office was merely to approve or disapprove of such sales as the al-lottees might make. Only the allottee could transfer the ownership of the timber on his land.
While both the advertisement for bids and the contract that plaintiffs signed warned that approval of the individual allottee was required with respect to timber on allotted property, the officials of the Indian Service, during the preliminary survey and when selecting trees for cutting, made no distinction between the allotted and unallotted timber. Nevertheless, if the Government had no right to dispose of the allotted *442 timber — indeed was statutorily prohibited from disposing of it — then its acts were of no effect until the various allottees agreed to sell it. A contract with the Government confers no enforceable rights unless the officer who purported to bind the United States had statutory authority, express or implied, to do so. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380 (1947); The Floyd Acceptance Cases, 74 U.S. (7 Wall.) 666 (1868), affirming 1 Ct. Cl. 270 (1865). Nor can the failure to make a distinction between allotted lands and un-allotted lands in selecting trees for cutting be construed as evidence of an intention to include the timber on allotted lands within the contract formally executed on May 2, 1949, in view of the express terms of the advertisement for bids and of the contract.
The evidence shows that plaintiffs obtained the right to cut timber on allotted lands by signing a separate contract pertaining to each individual allotment with the Superintendent of the Warm Springs Agency, who had first obtained a power of attorney from each of the allottees. The contract form spoke in terms of a present sale of timber- — effective on the date of its execution. The first such contract was signed on October 10,1949. Between that date and November 28, 1949, 55 such contracts were signed. Thirty-five more were made on June 14,1950; and an additional 43 were executed on June 11,1952. The last contract was signed on April 8,1953.
It therefore appears that none of the contracts concerning timber on allotted lands was effective more than six months prior to plaintiffs’ disposal of that timber. Accordingly, plaintiffs have not satisfied the six months’ holding period required under section 117 (k) (2), as to this timber. They are not entitled to capital-gains treatment of the income that they derived from the disposal of timber that stood on allotted lands.
Plaintiffs argue that the agreement of the allottees to sell their timber was a practical certainty at the time when the contract for the sale of timber on unallotted lands was made. The trees on the Simnasho Unit were all heavily infested with beetles, and, since the Interior Department would not approve a sale of the allotted timber to anyone except plain *443 tiffs during the then-current 25-30 year cutting cycle, failure of the allottees to agree to sign up with plaintiffs would have cost them the loss of the valuable asset that their timber holdings represented. The fact remains, however, that any allottee could have refused to make such a contract, and, if this had been done, plaintiffs could not have become the owners of or disposed of the timber of any dissident Indian. The fact that the Indian’s refusal to sell his timber would have amounted to an act of commercial insanity does not alter the picture; his agreement remained a prerequisite to any ownership vesting in plaintiffs.
We conclude that, under section 117 (k) (2) of the Internal Revenue Code of 1939, these taxpayers are entitled to treat as long-term capital gains their income from the disposal of timber that stood on unallotted lands. We also hold that their income from the disposal of timber cut from allotted parcels must, under section 117(k) (2) of the 1939 Code, be regarded as ordinary income. To the extent of this income, defendant’s deficiency assessment was correct.[5]
The case is remanded to the trial commissioner in accordance with Rule 47(c) for further proceedings to determine the amount the respective taxpayers are entitled to recover.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul R. Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. The separate timely petitions herein were filed pursuant to the provisions of Section 1491, Title 28 of the United States Code, for the recovery of Federal income taxes assessed against and collected from plaintiffs Harold Barclay and Dorothy Barclay for the calendar years 1951, 1952 and 1953, and for the recovery of Federal income taxes assessed against and collected from plaintiffs Philip Dahl and Dorothy Dahl for the calendar years 1950,1951,1952 and 1953.
*444 2. During tlie years 1951, 1952 and 1953, Harold Barclay and Dorothy Barclay, husband and wife, were and now are citizens of the United States, residing in the City of Sisters, County of Deschutes, State of Oregon. Their joint Federal income tax return for each of said years was filed with the former Collector or the former District Director of Internal Bevenue for the District of Oregon.
3. During the years 1950, 1951, 1952 and 1953, Philip Dahl and Dorothy Dahl, husband and wife, were and now are citizens of the United States, residing in the City of Bedmond, County of Deschutes, State of Oregon. Their joint Federal income tax return for each of said years was filed with the former Collector or former District Director of Internal Bevenue for the District of Oregon.
4. In 1943 Harold Barclay formed a partnership, known as the Barclay Logging Company, with one Burt Peterson, who was the stepfather of Philip Dahl. Upon the death of Peterson in 1944, Dahl became half owner of the Barclay Logging Company and, under date of January 15, 1945, Barclay and Dahl executed Articles of Partnership. Continuing through the taxable years 1950-53, they remained equal partners engaged in the business of logging timber under said name of Barclay Logging Company. The company engages in the work of doing, for various sawmill companies, the actual logging, i.e., the felling of trees, bucking (converting the trees to logs) and hauling the logs to the sawmill. It frequently performs such work pursuant to arrangements worked out orally between it and the sawmill company. Performing such logging work pursuant to informal oral arrangements is fairly common in this industry. Prior to 1949 Barclay Logging Company did logging mainly for a sawmill company called Tite Knot Pine Mill and its subsidiaries. Tite Knot is a sawmill which has been run by Dahl since 1944. During the years herein involved, Tite Knot Pine Mill was a partnership consisting of Dahl and one S. S. Johnson. The Barclay Logging Company partnership between Barclay and Dahl continues to exist to the present.
*445 5. Prior to 1948 Dahl had acquired certain timber in the eastern part of Oregon. At the time of such acquisition Dahl contemplated that the Barclay Logging Company would do the job of logging this timber and that Barclay would therefore, through his half interest in the company, ultimately share in the benefits of the acquisition. However, the timber was sold to another company before it was logged, with Barclay playing a substantial part in effecting the sale. Since Barclay Logging Company did not do the logging and since Barclay did not own any of this timber, he did not share in any of the gain that resulted to Dahl from this transaction.
6. (a) During a period commencing on November 26, 1948, and ending on January 17, 1949, the United States Department of the Interior advertised for bids for the purchase by bidders of approximately 107,500,000 board feet of Ponderosa pine and other species of timber on property described as the “Simnasho Logging Unit,” located on the Warm Springs Indian Reservation in the State of Oregon. The timber offered for sale was located on both allotted and tribal lands. Tribal lands are owned by the Indians as a whole while allotments are owned by individual Indians or heirs of individual Indians, having been allotted lands under certain acts of Congress. Of the volume of timber advertised for sale approximately two-thirds was on tribal land and one-third on allotment land.[6]
(b) The advertisement for bids was as follows:
UNITED STATES DEPARTMENT OE THE INTERIOR SALE OE TIMBER WARM SPRINGS INDIAN RESERVATION SIMNASHO LOGGING. UNIT
Sealed bids in duplicate on forms provided therefor, marked outside “Bid Simnasho Logging Unit” and addressed to the Superintendent, Warm Springs Indian Agency, Warm Springs, Oregon, will be received until *446 2:00 o’clock P.M. Pacific Standard Time, January 17, 1949, for the purchase of merchantable timber on a tract within the Warm Springs Indian Beservation, Oregon, described as the “Simnasho Logging Unit.” The unit includes about 51,883 acres of Indian trust lands, of which approximately 25,254 acres are timbered, with an estimated stand to be cut of approximately 101,000,000 feet, B.M. of ponderosa pine, and 6,500,000 feet B.M. of Douglas fir and other species. Of this volume approximately 32,000,000 feet B.M. of ponderosa pine and 1,300,000 feet B.M. of Douglas fir and other species stands on 26,464 acres of trust allotments for which separate approved contracts must afterward be made with allottees desiring to sell, and on terms similar to the contract for the unallotted timber. Each bid must state the price per thousand feet, B. M. Scribner Decimal C Log scale that will be paid for timber cut and scaled prior to any readjustment of rates as specified in the contract. No bid will be considered for less than $10.50 per thousand feet B.M. for ponderosa pine, and $6.00 per thousand feet B.M. for Douglas fir and other species. Each bid must be accompanied by a certified check in the amount of $35,000.00 on a solvent bank payable to the Special Disbursing Agent, Warm Springs Indian Agency, Warm Springs, Oregon. The deposit will be returned to unsuccessful bidders. The deposit of the successful bidder will be applied as part of the purchase price against timber cut on this unit only or retained as liquidated damages if the bidder shall not execute the contract and furnish satisfactory bond for $40,000.00 within sixty days from acceptance of his bid. The right to waive technical defects and to reject any and all bids is reserved. The contract will specify that all designated timber shall be cut and removed from the unit prior to April 1, 1960. For copies of the contract, blanks for submission of bids, and other information, apply to the Superintendent, Warm Springs Indian Agency, Warm Springs, Oregon. Dated this 26 day of November, 1948, at Washington, D.C. J. A. Krug, Secretary of the Interior.
7. On November 30, 1948, the Tribal Council of the Confederated Tribes of the Warm Springs Indian Beservation, which Council was the body representing the Indians with respect to tribal lands, adopted a resolution authorizing the *447 sale of timber on. tribal lands within the Simnasho Logging Unit. This resolution stated in part as follows:
Whereas, By Resolution No. 73 of May 22, 1941, the Tribal Council authorized the sale of the Simnasho Timber Unit, and
Whereas, On a number of subsequent occasions, the early sale of this unit has been urged, due to the severe infestation of Pine Bark Beetle in this area, and
Whereas, By teletype dated Nov. 26, 1948, the Secretary of the Interior has approved the sale of this timber unit, in accordance with recommendations made by the Warm Springs Indian Agency, and the Portland District Office of the Indian Service, and
Whereas, At a special meeting of the Tribal Council, held at Warm Springs, Oregon, on Nov. 30, 1948, the Tribal Council has reconsidered the matter of advertising the Simnasho Timber Unit for sale, and by this resolution, reaffirms its authorization of May 22, 1941, under the condition that the minimum acceptable bid price be set at $10.50 per M. ft. for ponderosa pine, and at $6.00 per M. ft., for fir and other species, and that any contract entered into covering the sale of timber within this unit provide that stumpage prices shall never be adjusted below $3.25 per M. ft., for ponderosa pine, and $2.00 per M. ft., for fir and other species.
Be it eurther resolved, That persons owning allotted timber lands within the Simnasho Timber Unit, have the right to sell or refuse to sell their timber holdings in connection with the sale of tribal timber, in accordance with their own desires.
8. Barclay and Dahl first learned that the Department of the Interior was offering this timber for sale in the latter part of November 1948. The fact that the Department had contemplated a sale of this timber had been common knowledge among persons in the logging trade in the vicinity of the Reservation for some time. Dahl and Barclay had seen a copy of the form of contract that the Department used for *448 tbe sale of timber on Indian Reservations. In November of 1948, Dabl, having in mind the services performed by Barclay on the transaction referred to in finding 5 but on which Barclay had realized no compensation or profits, suggested to Barclay that the two of them go together and attempt to buy the timber on the Simnasho Unit. Thus, if successful, Barclay could share in the profits of the timber itself, rather than only in the profits resulting from logging the timber. Upon Barclay’s agreement, Barclay and Dahl then together visited the Forestry Division of the Bureau of Indian Affairs at Warm Springs, Oregon, in early December 1948 to get all the information available on the proposed sale.
9. Shortly after their visit to the Forestry Division and still in early December 1948, Barclay contacted one Hans Milius, who was an expert on timber evaluation, and asked Milius to accompany him and others on a field trip to view the timber on the Simnasho Unit that had been offered for sale. Barclay, Dahl, Milius and two representatives of the Bureau of Indian Affairs, Nicholas Welter (the Bureau’s timber manager and the officer in charge of the proposed sale) and Cecil Atkins, went on the field trip in order that the employees of the Bureau could show the timber to the other parties. However, the party viewed only the east end of the area because it was the only part where the roads were accessible. In showing the area to the parties, Welter made no differentiation between the allotment and tribal lands.
lOu Barclay then engaged Milius to make an evaluation of the timber standing on the area advertised. Milius surveyed the remaining area on or about December 17, 1948. He examined the timber to determine its quality, lumber grade recovery, and possible profits before Federal taxes. He reported his findings to Barclay, who paid him for his services. In making his examination, no differentiation was made between the tribal and the allotted lands. Prior to the time the contract was entered into, no map was ever provided by the Bureau of Indian Affairs showing the allotments, nor was any description of the allotments given to Barclay or Dahl. The results of the findings of Milius, made orally, were that the proposed acquisition of the timber was a sound investment.
*449 11. The Bureau of Indian Affairs had been trying to sell the timber on the Simnasho Unit for several years, but for various reasons, including the condition of the lumber market and the lack of suitable roads, no one had shown any interest in this timber. The Bureau, the Tribal Council and the individual Indian allottee owners were anxious to sell the timber. The principal reason for their desire was the heavy beetle infestation of the timber in that area. The timber on the Simnasho Unit was one of the worst infested areas in central Oregon, having been in an epidemic condition for more than 10 years. There was an annual loss of approximately 3 percent of the timber in the unit every year and the losses were progressively increasing. The proposed sale was to be both a salvage sale and a control project, being designed to salvage the beetle infested trees that were still merchantable and also to eliminate the beetle population and break the epidemic.
12. The Simnasho Unit is on the north end of the Warm Springs Indian Reservation approximately 85 miles from Portland, Oregon, in north central Oregon. It is only one of several logging units on the reservation. In preparation for the disposal of the timber on a logging unit on the reservation, the timber is first cruised, a forest officer’s report is then written, permission is then obtained from whomever has jurisdiction over the timber, and bids for the purchase of the timber are then invited. It thus takes considerable time to get a unit ready for bids. This was the procedure that was followed on the Simnasho Unit. Bids are invited on a unit on the basis of a cutting cycle, which is approximately every 25 to 30 years.
13. (a) After Barclay received the report from Milius, Barclay communicated the findings to Dahl. Despite Milius’ conclusion, Barclay and Dahl were undecided for a time whether a bid should be submitted because of the poor market conditions in the timber industry at that time. Finally, on the last day on which a bid could be made, i.e., January 17, 1949, Barclay and Dahl decided that a bid at the minimum price set out in the advertisement would be submitted. They considered the tract as a whole without differentiation between tribal lands and allotment lands.
*450 Thereupon, both parties went to the office where the bids were to be deposited, and Dahl submitted a proposal in his own name offering to pay $10.50 per thousand board feet for Ponderosa pine and $6 per thousand board feet for Douglas fir and other species. At the same time Dahl deposited his certified check for $35,000, as required by the invitation. The amount of such deposit had been fixed by the Bureau of Indian Affairs upon the basis of a percentage of the estimated value of timber on both tribal and allotted lands. This general deposit did not include, however, the advance payments subsequently made pursuant to the individual contracts with respect to allotted lands hereinafter referred to, which were fixed by the Bureau upon the basis of a percentage of the estimated value of timber on each individual tract of the allotted lands.
(b) The form on which Dahl’s bid was submitted was a printed “proposal” form issued by the Bureau and which contained, on its reverse side, instructions pertaining to its execution and submission. Included in such instructions were the following:
If the proposal is made by individuals, acting neither as a firm nor as a corporation, each must sign.
If the proposal is made by a copartnership, the signature must consist of the name of the firm followed by the signature of each of the members of the firm.
The bid was signed only by Philip Dahl, and not by Harold Barclay.
(c) At the time the bid was submitted Barclay and Dahl had an oral understanding that if the contract was awarded to Dahl, he would assign to Barclay a one-half interest in the contract. The bid was submitted by Dahl alone rather than by Dahl and Barclay jointly since Dalfi at the time had the money available with which to pay the required $35,000 deposit and Barclay did not, and since they were so uncertain anyway as to whether the minimum bid would be accepted.
14. (a) Dahl’s bid was the only one that was submitted in response to the invitation.
(b) Under date of January 31, 1949, William E. Warne, an Assistant Secretary of the Interior, sent the following tele *451 gram to J. W. Elliott, the Superintendent of the Warm Springs Indian Agency at Madras, Oregon:
REURTEL 17. RID OF PHILIP DAHL FOR SIMNASHO TIMBER UNIT HEREBY ACCEPTED. SUBMIT CONTRACT BOND AND SUPPORTING PAPERS FOR APPROVAL.
15. On February 8, 1949, the Tribal Council of the Confederated Tribes of the Warm Springs Indian Reservation authorized, by resolution, the Secretary of the Interior to accept Dahl’s bid on tribal timber within the Simnasho Logging Unit. This resolution was one of the steps required with respect to the tribal lands prior to final approval of the contract. As to allotment lands, permission had to be obtained from the individual owners before contracts covering such lands were approved. As to such lands, the allottee generally signs a power of attorney authorizing the appropriate official of the Department of the Interior to sign a contract relating to the timber on his lands.
The Council resolution adopted on February 8,1949, stated in part as follows:
Be it therefore resolved, That the Secretary of the Interior be authorized to accept the bid of _ Philip Dahl on tribal timber within the Simnasho Logging Unit, the owners of allotted lands within the unit to be given the opportunity to sell their timber holdings in conjunction with the sale of the tribal timber, or to decline the opportunity to sell as they see fit.
Be it further resolved, That the Chairman of the Tribal Council be authorized to sign the timber sale contract covering this unit on behalf of the Confederated Tribes.
16. Under date of March 7,1949, “Timber Sale Contract” No. I-113-ind-2243, prepared by the Bureau of Indian Affairs, relating to the timber on the Simnasho Logging Unit, was signed by Dahl and the Acting Superintendent of the Warm Springs Indian Agency. On that date, Dahl also submitted the performance bond in the amount of $40,000 required by paragraph 19 of said contract. Under date of March 21, 1949, the contract was also signed by the Chairman of the Warm Springs Tribal Council, Confederated Tribes of the Warm Springs Indian Reservation of Oregon.
*452 17. The large amount of timber involved necessitated, under the Department’s requirements, that the contract with respect thereto be approved by the Secretary of the Interior. On March 22, 1949, a telegram was received by the Bureau of Indian Affairs in Warm Springs, Oregon, from the Department of the Interior in Washington, D.C., inquiring about the status of the contract and the reason for its delay in being forwarded to the Secretary. Within 2 or 3 days thereafter, the contract was forwarded to the Department in Washington.
18. (a) Under date of May 2, 1949, the contract was “Approved” on behalf of the Secretary of the Interior of the United States. “Approval” of the $40,000 bond on behalf of the Secretary also was given on May 2, 1949. Both such approvals were given by Assistant Secretary William E. Warne, the same person who sent the January 31 telegram that purported to accept Dahl’s bid.
(b) The contract, bearing such approval and approval date, was returned to Elliott, the Superintendent of the Warm Springs Indian Agency, by a letter dated April 28, 1949, from the Commissioner of Indian Affairs in Washington, D.C. Said letter read as follows:
We have received from Regional Director E. Morgan Price in sextuple the executed contract, bond and supporting papers covering the sale of timber on the Sim-nasho logging unit to Philip Dahl. The contract and bond have been approved. The original and four copies of each are returned herewith for distribution. One approved copy of each has been retained for our files.
19. (a) The contract (entitled “Department of the Interior, Indian Service, Forestry Division, Timber Sale Contract, Simnasho Logging Unit”) provided in part as follows:
1. This agreement, made and entered into at the Warm Springs Agency, Warm Springs, Oregon, under authority of the Act of June 25, 1910 (36 Stat. 857), and the Act of June 18,1934 (48 Stat. 984), between the Confederated Tribes of the Warm Springs Reservation of Oregon, party of the first part, the Superintendent of the Warm Springs Indian Agency, party of the second part, and Philip Dahl of Redmond, Oregon, party of the third part, hereinafter called the Purchaser.
2. Witnesseth, That the Confederated Tribes of the Warm Springs Reservation of Oregon, in consideration *453 of the agreements by tlie Purchaser agree to sell to the Purchaser, and the Purchaser agrees to buy upon the terms and conditions herein stated and the Indian Service General Timber Sale Regulations, approved April 10, 1920, by the Assistant Secretary of the Interior, which are attached to and made a part of this contract, all merchantable dead timber, standing or fallen, and all merchantable live timber marked or otherwise designated by the officer in charge for selective logging as required by said General Timber Sale Regulations, comprising trees approximately twelve inches and larger in diameter at a point four and one-half feet from the ground, located on unallotted lands within a tract of about 51,883 acres of Indian trust lands known as the Simnasho Logging Unit lying in the northern portion of the Warm Springs Indian Reservation, as shown on the attached map which is made a part hereof.
3. That the superintendent, in consideration of the agreements by the Purchaser, authorizes the Purchaser, and the Purchaser obliges himself to enter into separate contracts on the approved form with such Indians holding trust patented allotments within the logging unit as desire to sell their timber, subject to the terms of this contract. The purchaser further agrees to enter into said contracts within six months from the date of approval of this general contract, or within such extended period of time as may be authorized by the Commissioner of Indian Affairs.
4. The approximate area of the logging unit, exclusive of alienated land is as follows:

No rights under this contract are acquired in and to approximately 240 acres of alienated land lying within the logging unit.
5. The estimated volume of timber to be cut which estimate is not guaranteed is:

*454 6. For AND IN CONSIDERATION of tbe. agreements by the Confederated Tribes of the Warm Springs Beservation of Oregon and by the Superintendent, the Purchaser agrees that prior to April 1,1960, he will cut all timber covered by this contract and will pay to the Special Disbursing Agent, Warm Springs Indian Agency, Warm Springs, Oregon, for the use and benefit of the Indians entitled thereto, the full value of said timber as shall be determined on the basis of an actual log scale, at fixed rates per thousand feet, board measure, Scribner Decimal C Log _ Scale, which rates, until changed as hereinafter provided, shall be as follows:
For Ponderosa pine ten dollars and fifty cents.
For Douglas fir six dollars and no cents.
For other species six dollars and no cents.
7. The COMMISSIONER of INDIAN Affairs, with the approval of the Secretary after consultation with the Purchaser and the Indians involved, and after 30 days notice to the Purchaser, may revise stumpage rates within this contract at any time as the trend of economic conditions in the lumber industry may warrant: Provided, that any new rates so established shall not be less than:
For Ponderosa pine three dollars and twenty-five cents.
For Douglas fir and other species two dollars and no cents.
Provided further that the requirements of notice in this paragraph shall be satisfied when new stumpage prices, established under its authority, are made effective thirty (30) days after the Commissioner of Indian Affairs, with the approval of the Secretary, has given notice to the Indians involved and the Purchaser that he intends to proceed under the authority of this paragraph to change stumpage prices.
_ 8. The purchaser further agrees that prior to the time when the stumpage value of the timber cut from both allotted and unallotted lands shall exceed the cash deposit of $35,000.00 submitted with his proposal to purchase timber, he will make another cash deposit of $20,000.00 and subsequent deposits of $20,000.00 at such times as may be necessary to insure that the stumpage value of the timber cut and not paid for at any time shall not exceed the cash deposit then in the hands of the Special Disbursing Agent, Provided, that the last cash deposit in any logging season may be in the sum of not less than $10,000.00.
*455 9. The purchaser further agrees tbat within thirty days from the date of approval of the contract on each allotment he will pay twenty-five per cent of the estimated value of the timber thereon as an advance payment, and further, that within three years from the approval of such contract he will pay an additional fifteen per cent of the estimated value of the timber as an advance payment, and an additional ten per cent as an advance payment within six years of approval of the allotment contract; provided, That with respect to each allotment contract, no advance payment will be required in an amount that will make the sum of that payment, plus all previous advance payments, plus all advance deposits previously applied against timber cut from the allotment, exceed fifty per cent of the estimated value of the timber; provided further, that the estimated value of the timber shall be determined by applying the minimum stumpage rates stipulated in Section 7 of this contract to the volume originally estimated to be cut; provided further, That the stumpage rates governing at the time the timber shall be scaled shall be the rates charged for the timber actually cut. It is mutually understood and agreed, That the Commissioner of Indian Affairs, on his own initiative or upon submission by the Purchaser of evidence satisfactory to the Commissioner, in his discretion may revise the estimated volume of timber on any allotment because of errors in estimate, or because of fire or other losses not due to any act or neglect of the Purchaser, but not because of depletion through cutting under authority of the allotment contract, provided, that in case the advance payments made on any allotment contract exceed the total value of timber cut and removed from the allotment by the Purchaser it is mutually agreed that such payments are declared to be the value of such timber so cut and removed.
10. The purchaser further agrees that he will, unless relieved by the Commissioner of Indian Affairs, cut and pay for, from some portion of the sale area, including allotments at least 10,000,000 feet, board measure, Scribner Decimal C Log Scale, prior to April 1, 1950, and not less than 10,000,000 feet each twelve months thereafter until the contract is completed; that he will pay for, as merchantable timber, pieces ten feet and longer, will utilize the trees to a diameter of eight inches in the tops where straight and sound, and will pay for all timber on the basis of a scale recognizing sixteen feet as the maximum length of a single log; *456 and that all logs will be considered merchantable as provided for in the attached General Timber Sale Regulations.
*****
14. Tran purchaser further agrees that if fires for the starting or spread of which he,_ or any of his employees, his sub-contractors, or their employees, shall be responsible by act or neglect, shall destroy young growth under ten inches in diameter on any portion of the reservation, he will pay liquidated damages of ten dollars ($10.00) per acre for the area thus burned over unless a lesser rate for damages shall be approved by the Commissioner of Indian Affairs; and he agrees that in addition to these liquidated damages he will pay the damage that shall be caused to all timber ten inches and larger in diameter at four and one-half feet from the ground or to any other property of the Indians or the government. * * *
15. The Commissioner of Indian Affairs, with the consent of the Indians in General Council or their authorized representatives, may extend the time for completion of this contract.
$ $ $ ‡ $
19. It is further understood and agreed that this contract shall be null and void and of no effect until approved by the Secretary of the Interior and until the latter shall approve a bond in the penal sum of $40,000 conditioned on the faithful performance of all the terms of this contract and the General Timber Sale Regulations attached hereunto.
(b) Attached to the contract and made a part thereof were “General Timber Sale Regulations,” of the Bureau of Indian Affairs, Department of the Interior. Said regulations provided in part as follows:
4. No timber other than that sold may be cut by the purchaser on the sale area without a separate contract of sale therefor, and timber on allotments within a general sale area held under trust or restricted patents cannot be logged without a contract with the owners of the allotment approved by the proper officer.
‡ ‡ ‡
6. Title to the forest products covered by any contract will not pass to the purchaser until such product^ are paid for.
*457 9. The areas to be logged in any season may be designated by the officer in charge when in his judgment this is necessary to prevent deterioration from fire, worms, or other cause or to insure the logging of the sale unit in such manner as to fully protect the interests of the United States and the Indians. When logging is begun on an allotment or natural logging unit, it will not be discontinued and started elsewhere without the written consent of the officer in charge.
% # % &
21. A check scaler employed by the purchaser may at hours convenient to the scaler and with the consent of the officer in charge compare his scale of logs with that of the scaler. A copy of the regular scale reports will be furnished to the purchaser through the officer in charge.
# * * * ❖
28. Forest fires on the sale area or adjacent lands during the contract period will be prevented or suppressed by the purchaser, his employees, and subcontractors whenever possible. When called upon by an authorized forest officer, they will work under his directions to suppress fires. If the purchaser or his employees or subcontractors were not directly or indirectly responsible by act or neglect for the origin or the spread of the fire, reimbursement will be made, except that such reimbursement shall not exceed one-half the cost of suppression within the sale area or within one-half mile of the same.
‡ $ H* $
39. Improvements necessary to execute his contracts, such as camps, sawmills, railroads, roads, telephone lines, chutes, bridges, sluices, and dams, may be constructed and maintained by the purchaser on and across the contracted area and other tribal lands, subject to regulation by the Commissioner of Indian Affairs.
* * * * *
42. The time limit for the removal of the improvements and other property of the purchaser is 1 year after the expiration of the contract. After that time the title to improvements, including camps, will attach to the land, and no personal property of the purchaser will thereafter be removed except with the written consent of the officer in charge: Provided, That improvements necessary for the logging of other Indian timber may be left for such time and on such terms as may be prescribed by the Commissioner of Indian Affairs.
*458 43. Extension of time for the performance of any contract may be granted the purchaser by the officer approving the contract, in his discretion and subject to such conditions as he may impose.
44. If extension of time to cut and remove the timber is not granted by the officer approving a contract, the purchaser can cut no timber after the expiration of the contract, but he may remove the timber, previously cut and paid for, within 1 year of the expiration of the contract. If not removed within the time allowed, the title will revert to the vendor notwithstanding the purchaser may have paid for the timber.
45. Assignment of any contract in whole or in part by the purchaser will not relieve him of his contract obligations unless the assignment is approved by the officer approving the contract nor until the bond is satisfactorily renewed.
46. Refunds of overpayments will be made to the purchaser by the approving officer provided all terms of the contract have been fulfilled, and the approving officer may also, in his discretion, reduce the amount of timber that is required by the contract to be paid for and removed in any one year.
:|: * is * m
56. Failure of the purchaser to complete his contract or to log promptly an area damaged by fire, wind, insects, or other causes, or the commission by him of any act for which the officer approving his contract shall declare the contract forfeited, will render the purchaser and his bondsmen liable for the depreciation in the value of the remaining timber on an estimate of value and quantity to be made under the direction of the officer approving this contract.
$ $ $ $ $
20. (a) During April 1949, Dahl sought permission from the local officials of the Bureau of Indian Affairs to use a favorable site in the Simnasho Unit for the commencement of the construction of a sawmill. Dahl desired to begin the construction immediately because, under the contract, the first contract year was from April 1,1949 to March 31,1950, during which time a minimum of 10 million board feet of timber was required to be cut. Although the contract had not as yet been approved by the Secretary of the Interior, the Bureau’s local officials, feeling certain that the contract would be approved since Dahl had satisfactorily fulfilled all *459 tixe prerequisites, orally approved the location of the site for the sawmill sometime before the middle of April 1949.
(b) On or about April 18, 1949, clearing of the millsite was commenced. This was done by pushing and pulling full length trees over. The trees were not bucked at that time but were merely pushed out of the way in order that the construction of the mill could be started. Local representatives of the Bureau, including its timber manager Nicholas Welter, who was administering the project, were present at the mill-site as this work was being done. Between the 20th and 25th of April 1949 the actual construction of the sawmill began. Representatives of the Bureau were also present from time to time as the sawmill was being constructed.
In administering contracts such as that herein involved relating to the Simnasho Unit, the Bureau of Indian Affairs has its employees on the land at all times, marking trees for cutting and generally supervising other activities on the land such as road building, fire precautions and trash disposal.
21. (a) As provided in paragraph 3 of the contract, Dahl signed numerous separate contracts with the Superintendent of the Warm Springs Indian Agency, acting for the individual Indians holding trust patented allotments of timber-lands within the Simnasho Logging Unit. Fifty-five such separate contracts were executed on dates ranging from October 10,1949 through November 28,1949. Thirty-five such contracts were executed on June 14, 1950; forty-three on June 11, 1952; and the last contract on April 8, 1953. The individual Indian owners or their heirs were contacted prior to the execution of said contracts by a representative of the Bureau of Indian Affairs to have them sign powers of attorney authorizing the Superintendent of the Warm Springs Indian Agency to enter into these contracts. The individual Indian owners of allotted lands on the Simnasho Unit were anxious to enter into contracts with Dahl, and all of them eventually did. As shown (findings 11, 12), had they not signed such contracts, much of their timber might have been lost through beetle infestation, and they could have lost the opportunity to dispose of their timber for perhaps another *460 25 or 30 years. None of tbe negotiating with tbe individual Indians was done by Dahl or Barclay.
(b) The following is a copy of a typical timber contract entered into between Philip Dabl and the Superintendent of tbe Warm Springs Indian Agency, acting for an individual Indian allottee:
Simnasho Logging Unit
Allotment No.-
Contract No. I-113-ind-
UNITED STATES
DEPARTMENT OE THE INTERIOR BUREAU OE INDIAN AEEAIRS
TIMBER CONTRACT
This agreement, made and entered into at the Warm Springs Indian Agency, Warm Springs, State of Oregon, this-day of_, 19_, under authority of the act of Congress of June 25, 1910 (36 Stat. 855, 857), between the Superintendent of the Warm Springs Indian Agency, as authorized by the attached Power-of-Attorney, for and in behalf of_
Indian under the jurisdiction of the Superintendent of the Warm Springs Indian Agency, party of the first part, and Philip Dahl of Redmond, Oregon, party of the second part,
Witnesseth, That the party of the first part agrees to sell to the party of the second part, upon the terms and conditions hereinafter stated, all the merchantable dead timber, standing or fallen, and all the live timber marked or otherwise designated by the officer in charge for selective logging estimated to be_feet B.M. of ponderosa pine, and-feet B.M. of Douglas fir and other species, more or less, on the following described lands to wit:
—_-within the limits of the Simnasho Logging Unit, Warm Springs Indian Reservation, situated in the County of Wasco, State of Oregon, the same being lands which have been allotted to_
-under the provisions of the Act of February 8,1887 (24 Stat. 391).
*461 For AND in consideration of the foregoing the party of the second part agrees to pay to the Superintendent of the Warm Springs Indian Agency, Warm Springs, State of Oregon, the sum of-dollars ($_), more or less, as shall be determined by actual scale, measurement, or count, for the said timber at the rate of ten and 50/100 dollars ($10.50) per M. ft., B.M., Scribner Decimal C Log Scale for ponderosa pine, six and 00/100 dollars ($6.00) per M. ft., B.M., for Douglas fir and six and 00/100 dollars ($6.00) per M. ft., B.M. for other species, until such rates are revised as provided by the general contract covering the Simnasho Logging Unit, in trust for said party of the first part.
The party of the second part further agrees to pay twenty five percent (25%) of the estimated value of the timber sold, computed at the minimum rates stipulated in Section 7 of the general contract covering the Sim-nasho Logging Unit, within thirty days from date of approval of this contract by the Superintendent of the Warm Springs Indian Agency; to pay fifteen percent (15%) additional within three years from date of approval of this contract and to pay an additional ten percent (10%) within six years from the date of approval of this contract, and to make advance deposits as shall be necessary to cover all timber prior to cutting as required by the attached Indian Service General Timber Sale [Regulations, which are made a part of this contract, and as provided in the general contract covering the Simnasho Logging Unit.
The party of the second part further undertakes and agrees that he will cut and remove the said timber in strict accordance with the following specifications and the attached Indian Service General Timber Sale [Regulations which are prescribed by the Department of the Interior as to the sale of timber from Indian lands.
1. The approxiMate minimum diameter limit at a point 414 feet from the ground to which living trees are to be cut is twelve inches for all species.
2. The maximum scaling length of all logs will be sixteen feet. Timber will be considered merchantable as provided in the attached regulations.
3. Unless extension of time is granted by the officer approving this contract, all timber will be cut and removed on or before April 1,1960.
*462 4. The cost of examination, advertisement, marking, and scaling of timber and the expenses of general supervision and protection of the sale area and adjacent areas from fires by United States officers shall be paid from the proceeds of the sale of timber.
It is further understood and agreed that this contract shall be void and of no effect until approved by the Superintendent of the Warm Springs Indian Agency.

(c) Payments for timber cut from allotment lands were collected by the Bureau and distributed to the individual Indians. Neither Dahl nor Barclay had anything to do with this bookkeeping or disbursement.
(d) The scale books which the Indian Service used to measure timber cut on tribal and allotment lands contain the following statement:
It is very important that timber cut from allotments shall be kept separate in order that each individual may be given credit for the timber that is actually cut and removed from his land. Scalers will familiarize themselves with the allotment lines in the vicinity where they are working, and will keep in constant touch with the logging operations so that they may always know from what description of land the logs which they are scaling were cut.
*463 22. On October 12, 1949, Dahl deposited an additional $12,000, and on October 21, 1949, an additional $2,280.97, with, the Burean of Indian Affairs, as requested by it. These deposits were made as required by certain of the individual contracts relating to allotted lands.
23. The clearing of the site and the construction of the sawmill, which as shown commenced on or about April 18, 1949 (finding 20), proceeded thereafter, being accomplished with funds, equipment and employees of the Barclay Logging Company, since this firm had the available facilities and men. Accumulated costs of building the sawmill were recorded in an account entitled “Mill Construction,” and were eventually charged to the capital accounts of Dahl and Barclay. As of October 25, 1949, total construction costs were approximately $155,000.
24. (a) As part of the preliminary planning concerning how to handle the performance of the Simnasho Logging Unit contract, it was Dahl’s and Barclay’s understanding that the Barclay Logging Company would log the timber, and that the sawmill being built on the Simnasho Unit would mill it into rough lumber.
Prior to October 25, 1949, Dahl and Barclay decided to organize a corporation to which the sawmill would be transferred. The understanding was that the Barclay Logging Company would log the timber and that the corporation would mill it.
(b) The new corporation, called Dahl Pine, Inc., was organized on October 21, 1949 as a corporation under the laws of Oregon, with a capital of $100,000, represented by 1,000 shares of common stock. 499 of these shares were issued to Dahl, 499 to Barclay and 2 qualifying shares to their accountant, one H. A. Hollopeter. Hollopeter had no investment in the corporation.
25. On October 25,1949, the following occurred:
(a) The first meeting of the stockholders (Dahl, Barclay and Hollopeter) was held. At such meeting, Dahl, Barclay and Hollopeter were elected the directors of the corporation. Thereafter, the first meeting of the directors was held, at which Dahl was elected president of the corporation, Hollo-peter, vice president, and Barclay, secretary-treasurer.
*464 (b) The sawmill was transferred by Dahl and Barclay to the corporation for all of the corporation’s shares of capital stock, Barclay and Dahl each receiving $50,000 of the capital stock of the corporation, including one qualifying share each of the two issued to Hollopeter. These shares were charged by Barclay Logging Company to the capital accounts of Dahl and Barclay. The $55,000 difference between the then total of the construction costs and the $100,000 stated capital was shown on the books of Dahl Pine, Inc. as an account payable to Barclay Logging Company (and paid to it at a later date). The corporation’s assets were valued at $155,000.
(c) Dahl lent $100,000 to the corporation, which loan was evidenced by a promissory note payable in 4 years. This loan was made in order to provide working capital for the corporation and so that the balance of the cost of the sawmill, beyond the $100,000 of capital stock, could be paid to Barclay and Dahl. Dahl had advanced more toward the building of the sawmill than had Barclay.
(d) Dahl assigned a one-half interest in the Simnasho Logging Unit contract to Barclay by an “Assignment” which stated as follows:
The undersigned has entered into a contract with the Department of the Interior, Indian Service, Forestry Division, covering the cutting of approximately 100,-000,000 feet of timber on Indian lands. He has deposited as an advance payment the sum of $47,000.00 and has executed a performance bond in the amount of $40,-000.00. The undersigned has also advanced to Dahl Pine, Inc., an Oregon corporation, the sum of $100,-000.00, evidenced by a note in that sum payable on or before four years, bearing interest at the rate of 5 percent per annum, with a provision in said note for payments on the 10th day of each month of a sum equivalent to $2.00 per thousand feet board measure on all lumber sales for the preceding month.
Now, THEREFORE, in consideration of the premises, and of the sum of $23,500.00 and the agreement of the as-signee herein to share equally in the liability under the performance bond and the timber purchase contract, the undersigned hereby sells, assigns, transfers and sets over unto Harold Barclay an undivided one-half interest in and to said contract with the Department of the Interior, Indian Service, Forestry Division, subject, however, to termination at the option of the undersigned in the *465 event of any default by Dalil Pine, Inc. in the payment of its note in the principal sum of $100,000.00 to the undersigned.
In the event of default, the undersigned shall be deemed to have elected to terminate the interest of the assignee hereunder if proceedings are instituted for the collection of said note, or if Dahl Pine, Inc. shall transfer to the undersigned the property which it has mortgaged to secure the payment of said note.
In witness whereof, the undersigned has hereunto set his hand this 25th day of October, 1949.
Philip Dahl.
The purpose of executing this “Assignment” was to put in writing the previous oral understanding of the parties concerning Barclay’s sharing in the profits arising from the disposition of the timber itself as well as from the logging operation.
26. When Dahl and Barclay organized the Dahl Pine, Inc. corporation, it was their understanding that Barclay Logging Company would cut the timber required by the contract, that Dahl Pine, Inc. would mill and sell this timber, that Dahl Pine, Inc. periodically would pay Dahl and Barclay as individuals the fair market value as determined by them of the timber cut, at stumpage rates, and that Dahl and Barclay in turn would make the payments to the Bureau of Indian Affairs required under the contract. There was nothing put in writing either contemporaneously or at any time subsequently which spelled out definitively the details of the various obligations assumed by Barclay and Dahl as individuals, or by Barclay and Dahl as partners doing business under the name of the Barclay Logging Company, or by the Dahl Pine, Inc. corporation, of which Barclay and Dahl were the sole owners, incident to the carrying out of such understanding.
27. (a) The sawmill, located on the Warm Springs Indian [Reservation, was completed on November 14,1949, and the first rough lumber was manufactured by it that day. Its total cost was approximately $175,000. The first lumber produced by the sawmill was sold to Dant & Bussell, a company in Bedmond, Oregon. This arrangement lasted only until the end of the year 1949, after which time the *466 lumber was sold by Dahl Pine, Inc. to Ponderosa Mouldings, Inc.
(b) On February 15, 1950, Dahl Pine, Inc. (referred to therein as “Dahl”) entered into a contract with Ponderosa Mouldings, Inc. (referred to as “P. M. I.”), which recited in part that “Whereas, Dahl owns and operates a sawmill at Warm Springs Indian Keservation,” Dahl agreed to sell to P. M. I. “all lumber produced by its mill,” and P. M. I. agreed “to purchase all said lumber,” upon prices based on a formula set forth in the contract;[7] that the agreement was to remain in force until December 31, 1950, and from year to year thereafter, with either party being given the right, however, upon serving written notice, to terminate after December 31, 1950; and that Philip Dahl “as a representative of Dahl,” would “have equal voice in the management of P. M. I. in determining all questions relating to P. M. I. operations and sales under this agreement.”
28. As shown (finding 26), it was understood that Dahl Pine, Inc. was to pay Dahl ,and Barclay the fair market value of the timber. This arrangement was to be based generally upon the same considerations as those set forth in paragraph 7 of Dahl’s contract with the Department of the Interior, i.e., the rates would be such “at any time as the trend of economic conditions in the lumber industry may warrant” (finding 19(a)). Such fair market value was set at meetings held from time to time, attended by Dahl and Barclay and their accountants. In setting this value they relied on prices published by the Western Pine Association (a publication also used by the Bureau of Indian Affairs in similarly determining prices under its contracts), and the West Coast Lumber Association. However, there was no formal or written agreement to give any advance notice of price changes similar to that contained in said paragraph 7. On at least one occasion a change in the price paid *467 by Dahl Pine, Inc. to Dahl and Barclay was made retroactively, when Dahl, Barclay and Hollopeter decided in September 1953 that the corporation had been paying too much for timber for the past 9 months and retroactively reduced the price, effective as of January 1953. The lumber market that year was in a state of decline.
Similarly, as noted in finding 26, there was no written contract definitively setting forth the details of the arrangement between Dahl Pine, Inc. and Barclay Logging Company with respect to logging the Simnasho Unit timber. In addition to the fact that such a formal contract would have necessitated the same parties dealing with each other (although in different capacities) as opposite contracting parties, this type of work is, as hereinabove pointed out (finding 4), frequently carried out in this industry pursuant to oral arrangements. The price paid for this work too was adjusted by the parties from time to time.
29. (a) The Bureau of Lidian Affairs “scaled” (i.e., measured to determine the number of board feet contained therein) the logs in order to record what trees were cut and determine what amounts were owing from Dahl under the contract. The first scaling was done on November 3, 1949, when a total of 350 logs were scaled. These logs, as well as the logs scaled the following few days, resulted from the trees which had been pushed and pulled over in order to clear the millsite in April 1949 (finding 20 (b)). These logs were all scaled on Section 25, Township 6, Bange 10, which is the section on which the sawmill was located. Just prior to being scaled these logs were bucked and pushed into the sawmill pond by the Barclay Logging Company. All of this first scaling was done in order to record the logs resulting from bucking the trees pushed over to clear the millsite. The first of these logs were sawed into lumber on November 14,1949.
(b) Scaling of logs resulting from the actual felling of trees on the Simnasho Unit (as distinguished from the pushing and pulling operation incident to the clearing of the mill-site) was first started on November 9,1949. This scaling resulted from the actual first felling and logging on the Sim-nasho Unit, which was begun sometime between November *468 3 or 4 and November 9, 1949. The representatives of the Bureau of Indian Affairs who were doing the scaling were working fairly close behind the fallers. There was no scaling from any section other than Section 25 upon which the mill was located until November 9,1949.
30. In addition to the scaling that was done by the Bureau of Indian Affairs, the Barclay Logging Company ran a check scale of its own to determine the labor that went into the logs scaled because the fallers (loggers who actually cut the trees) were paid on the basis of the trees felled. In doing this scaling, the company made no distinction between trees cut on tribal and allotment lands. The determination as to whether the trees came from allotment or tribal lands was made by the Bureau. The officer in charge of the timber sale of the Bureau determined what live trees were to be cut. The Bureau supervised all cutting, fire precautions and slash disposal.
31. Separate sets of books were kept for the three entities involved, i.e., Dahl Pine, Inc., Barclay Logging Company, and the individuals Harold Barclay and Philip Dahl. Separate bank accounts were kept in separate banks for each of the three entities. Dant & Bussell and then Ponderosa Mouldings, Inc. paid Dahl Pine, Inc. for the lumber they purchased from it. Dahl Pine, Inc. in turn paid Barclay and Dahl for the timber that was cut at a price based on the fair market value (set by Dahl and Barclay and their accountants) per thousand board feet as it was cut. Dahl paid the Bureau of Indian Affairs at the agreed price called for under the contract with it and as adjusted from time to time by the Bureau, by making deposits in advance of cutting to the Bureau. The Bureau sent monthly cutting reports to Dahl, showing how the timber actually cut during the previous month was applied against those deposits.
32. On June 14, 1950, Dahl signed an agreement with the Forest Service of the United States Department of Agriculture, relating to certain timber located on the area in the Mt. Hood National Forest designated as “Clear Creek No. 1.”
33. On July 31, 1950, Dahl signed an agreement with one William M. Bjornstad, relating to certain timber located near the Warm Springs Indian Beservation.
*469 34. In signing both the “Clear Creek No. 1” contract and the “Bjornstad” contract, Dahl was acting on his own behalf and on behalf of Harold Barclay. In both of these contracts Barclay and Dahl were acting jointly and had orally agreed to share equally in the timber acquired.
35. On June 18, 1952, Dahl and Barclay signed an agreement with the Forest Service of the United States Department of Agriculture, relating to certain timber located on the area in the Mt. Hood National Forest designated as “Clear Lake Butte.”
36. On October 28, 1952, Dahl and Barclay signed an agreement with the Forest Service of the United States Department of Agriculture, relating to certain timber located on the area in the Mt. Hood National Forest designated as “Clear Creek No. 2.”
37. The logging and milling of the timber referred to in findings 32, 33, 35 and 36 were handled in the same maimer and under the same understanding as the logging and milling of the Simnasho Unit timber.
38. In Philip Dahl’s Federal income tax return filed for the year 1949, he reported a sale to Barclay on October 25, 1949, of a one-half interest in the “timber cutting rights” acquired with respect to the Simnasho Unit. In his Federal income tax returns filed for the years 1950-53, Harold Barclay reported the date of his acquisition of the “timber cutting rights” on the Simnasho Unit as October 25,1949.
39. Plaintiffs Harold Barclay and Dorothy Barclay filed a timely joint Federal income tax return for the calendar year 1951, reporting net income of $70,848.30, including 50 percent of the net long-term capital gains, which they contend were realized from the disposition of such timber in the total amount of $108,316.10.
40. Plaintiffs Harold Barclay and Dorothy Barclay filed a timely joint Federal income tax return for the calendar year 1952, reporting net income of $107,906.19, including 50 percent of the net long-term capital gains, which they contend were realized from the disposition of such timber in the total amount of $107,470.54.
41. Plaintiffs Harold Barclay and Dorothy Barclay filed a timely joint Federal income tax return for the calendar *470 year 1953, reporting net income of $101,380.15, including 50 percent of the net long-term capital gains, which they contend were realized from the disposition of such timber in the total amount of $54,965.76.
42. Plaintiffs Philip Dahl and Dorothy Dahl filed a timely joint Federal income tax return for the calendar year 1950, reporting net income of $136,650.62, including 50 percent of the net long-term capital gains, which they contend were realized from the disposition of such timber in the total amount of $97,107.92.
43. Plaintiffs Philip Dahl and Dorothy Dahl filed a timely joint Federal income tax l’eturn for the calendar year 1951, reporting net income of $202,380.99, including 50 percent of the net long-term capital gains, which they contend were realized from the disposition of such timber in the total amount of $108,316.10.
44. Plaintiffs Philip Dahl and Dorothy Dahl filed a timely joint Federal income tax return for the calendar year 1952, reporting net income of $152,587.84, including 50 percent of the net long-term capital gains, which they contend were realized from the disposition of such timber in the total amount of $107,470.54.
45. Plaintiffs Philip Dahl and Dorothy Dahl filed a timely joint Federal income tax return for the calendar year 1953, reporting net income of $220,019.68, including 50 percent of the net long-term capital gains, which they contend were realized from the disposition of such timber in the total amount of $54,965.76.
46. Under date of February 19, 1959, plaintiffs Harold Barclay and Dorothy Barclay received from the Commissioner of Internal Kevenue a timely statutory notice of income tax deficiencies asserted against them for the years and in the amounts as follows:
1951_ $40,578.83
1952_ 53,314.05
1953_ 26,814. 66
120,707.54
47.Under date of February 19, 1959, plaintiffs Philip Dahl and Dorothy Dahl received from the Commissioner of Internal Kevenue a timely statutory notice of income tax *471 deficiences asserted against them for the years and in the amounts as follows:
1950_$42,022.79
1951_ 63, 596. 07
1952_ 54,956.65
1953_ 33, 834.98
194,410.49
48. The principal adjustments which gave rise to such deficiencies were the elimination of the net long-term capital gains reported with respect to the receipts of Dahl and Barclay described in findings 26,28 and 31 from Dahl Pine, Inc. during said years, and corresponding increases in the respective plaintiffs’ ordinary income in the full amount of such gains.
49. Under date of July 15,1959, plaintiffs Harold Barclay and Dorothy Barclay forwarded to the District Director of Internal Revenue at Portland, Oregon, their check in the amount of $167,136.03 in payment of the tax deficiencies of $120,707.54, plus an additional amount of $46,428.49 as interest thereon.
50. Under date of July 27, 1959, plaintiffs Philip Dahl and Dorothy Dahl forwarded to the District Director of Internal Revenue, at Portland, Oregon, their check in the amount of $275,122.92 in payment of the tax deficiencies of $194,410.49, plus an additional amount of $80,712.43 as interest thereon.
51. On or about October 1,1959, plaintiffs Harold Barclay and Dorothy Barclay filed with the District Director of Internal Revenue in Portland, Oregon, their refund claims for the years and in the amounts as follows:
1951-$58,344.02
1952- 73, 537.57
1953- 35,477.51
167,359.10
52.On or about October 1, 1959, plaintiffs Philip Dahl and Dorothy Dahl filed with the District Director of In *472 ternal Revenue in Portland, Oregon, their refund claims for the years and in the amounts as follows:
1950_$63, 059. 39
1951_ 91,600.44
1952_ 75, 883.52
1953_ 44,857.17
275, 400. 52
53. The claims referred to in findings 51 and 52 for each of the years set forth therein included the amount of interest paid on the deficiencies assessed. Said claims for refund were based upon the same grounds as those set forth in the separate petitions filed herein.
54. Under date of November 13, 1959, the respective plaintiffs received separate statutory notices of the disallowance of each of said refund claims by certified mail as provided in Section 6532(a) (1) of the Internal Revenue Code of 1954.
55. The respective plaintiffs are the sole owners of the claims upon which the petitions are based, and there has been no assignment or transfer of said claims or any part thereof or of any interest therein to any other person, firm or corporation. No action, other than the instant one and as heretofore described, has been taken on these claims by the Congress or by any department of the Government or in any judicial proceeding, including any in the Tax Court of the United States.
56. With the approval of the commissioner, the parties have stipulated, pursuant to the provisions of Rule 38(c) (now Rule 47(c)), that if the respective taxpayers are entitled to recover, the amount of their separate recoveries may be determined in further proceedings.
57. With the consent of the parties, a joint trial was conducted in these cases pursuant to the provisions of Rule 38 (a) (now Rule 47(a)).
conclusion of law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover upon so much of their claim as relates to income from the disposal of *473 timber from unallotted lands on the Warm Springs Indian Reservation, but that they are not entitled to recover for that portion of their claim that relates to income from the disposition of other timber. The amount of recovery will be determined pursuant to Rule 47(c) of the rules of this court.

 In the case at bar, plaintiffs could assign the contract, but an assignment of it did not relieve them of liability on it, unless the sellers consented.

 Section 7 of the Act of June 25, 1910, 36 Stat. 855, 857, 25 U.S.C. § 407 (1958).

 Section 61.13 of the General Forest Regulations, 25 C.F.R. 62 (1949), made such approval a prerequisite to the sale of timber on unallotted lands.

 Except, of course, for the approval of the Tribal Council, -which was required by the General Forest Regulations that the Bepartment promulgated. See footnote 3, supra.

 The parties have also stipulated that the tax treatment of income from the disposal of timber on certain tracts outside of the Simnasho unit shall be governed by the outcome of this case. Since that timber was also acquired after April 25, 1949, plaintiffs did not hold it for six months prior to its disposition and are not entitled to capital-gains treatment of the revenue it produced.

 The volume ultimately cut from tribal lands was 60,310,430 feet and from allotted lands 33,121,270 feet over the entire 10-year period of the contract. However, during the years at issue, i.e., 1950 through 1953, the volume cut from allotted lands was approximately 50 percent of the total.

 The agreement also stated that as of the same date, P. M. I. had in addition “entered into an agreement with Philip Dahl and S. S. Johnson, copart-ners doing business as Tite Knot Pine Mill, for the purchase of their entire mill cut at prices and on terms identical to those herein contained.” P. M. I. agreed that its “entire facilities” would be used “exclusively for drying and remanufacturing lumber and the production of mouldings, from lumber furnished by Dahl and Tite Knot Pine Mill, and no others.”